UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

DAVIA LOTOYA SMITH,                )    Civil Action No.: 4:19-cv-02883-TER
                    Plaintiff,      )
                                    )
        -vs-                        )
                                    )         **ORDER**
ANDREW M. SAUL,                     )
Commissioner of Social Security,   )
                    Defendant.      )
_____    )

        This is an action brought pursuant to Section 205(g) of the Social Security Act, as amended,

42 U.S.C. Section 405(g), to obtain judicial review of a "final decision" of the Commissioner of

Social Security, denying Plaintiff's claim for supplemental security income (SSI).  The only issues

before the Court are whether the findings of fact are supported by substantial evidence and whether

proper legal standards have been applied. This action is proceeding before the undersigned pursuant

to 28 U.S.C. § 636(c) and Fed. R. Civ. Proc. R. 73.

## I.  RELEVANT BACKGROUND

### A.    Procedural History

        Plaintiff filed an application for SSI on September 18, 2013, alleging inability to work since

December 29, 2011. The alleged onset date was amended to September 18, 2013.  (Tr. 63).  Her

claims were denied initially and upon reconsideration.  Thereafter, Plaintiff filed a request for a

hearing. Hearings were held in May 2016, June 2016, and February 2017, at which time Plaintiff and

a VE testified.  (Tr. 13).  The Administrative Law Judge (ALJ) issued an unfavorable decision on

June 15, 2017, finding that Plaintiff was not disabled within the meaning of the Act.  (Tr. 116). The

Appeals Council remanded in May 2018. (Tr. 123).  Another hearing was held November 15, 2018.

(Tr. 33). The Administrative Law Judge (ALJ) issued an unfavorable decision on January 31, 2019,

finding that Plaintiff was not disabled within the meaning of the Act. (Tr. 24). Plaintiff filed a request for review of the ALJ's decision, which the Appeals Council denied on June 26, 2019, making the ALJ's decision the Commissioner's final decision. (Tr. 1-3). Plaintiff filed this action on October 11, 2019. (ECF No. 1).

## B.     Plaintiff's Background and Medical History

Plaintiff was born on February 7, 1981, and was thirty-two years old at the time of the amended alleged onset date. (Tr. 22). Plaintiff alleges disability initially due to osteoarthritis, fibromyalgia(FM), restless leg syndrome, and carpal tunnel. (Tr. 82). Plaintiff had more than a high school education and had past relevant work as a newspaper deliverer and sales clerk. (Tr. 22).

## 2013

On September 19, 2013, Plaintiff was seen by Dr. McKay of Farrell McKay ENT. (Tr. 482). Plaintiff complained of three days of sore throat. Her nasal congestion and rhinitis were controlled. Plaintiff was negative for bone/joint symptoms. (Tr. 483-484). Plaintiff had no edema or tenderness and no unusual anxiety. (Tr. 485).

On September 30, 2013, Plaintiff was seen by Dr. Burnett of McLeod Family Sports Medicine complaining of right hip pain and stiffness. Plaintiff reported leg numbness/tingling and right knee pain. (Tr. 492). Upon exam, Plaintiff had positive tenderness in the greater trochanter and posterior hip with decreased range of motion and no edema. (Tr. 492). Affect was normal. (Tr. 493). Upon inspection of back, Plaintiff had exaggerated lordosis, moderate SI joint tenderness, positive straight leg testing on right, and antalgic gait. (Tr. 493). X-rays were normal. (Tr. 493, 719). Plaintiff was advised to continue home exercise. Diclofenac was prescribed. (Tr. 493). On October 2, 2013, imaging was normal. (Tr. 517-530).

2

On October 3, 2013, Plaintiff presented to the emergency room. Plaintiff reported a history of asthma, FM, diabetes, and hernia. (Tr. 532). Upon exam, Plaintiff was in no acute distress. Plaintiff's right foot had moderate tenderness to palpation. (Tr. 532). Plaintiff was prescribed pain medication; impression was ligamentous sprain of right toe. (Tr. 533).

On November 18, 2013, Plaintiff was seen by Dr. Patel of Carolina Rheumatology for fibromyositis, restless legs, and multiple joint pain. (Tr. 546). Plaintiff reported pain in her shoulder, hands, hip, knee, neck, and legs and fatigue. Plaintiff had no difficulty with activities of daily living and no anxiety, migraines, or carpal tunnel. "Diclofenac tolerated well, no swelling is noted, no new issues, pain is better." (Tr. 547). Exercise intolerance was noted under review of systems. (Tr. 547). Upon exam, Plaintiff had no acute distress, was morbidly obese, and ambulated normally. Plaintiff had normal mood/affect. Plaintiff had tenderness of thighs and calves without swelling or warmth. Plaintiff had normal hands, wrist, feet, ankles, and shoulder exam with no tenderness and full range of motion. Elbows and right hip were tender to palpation. Knee had crepitus and tenderness. Plaintiff had paraspinal tenderness and 10/18 trigger points. (Tr. 548). Plaintiff had stable fibromyositis and restless legs ; diclofenac was refilled. Plaintiff had improving multiple joint pain. (Tr. 548). Obesity was listed as worsening. (Tr. 549). Dr. Patel noted FM symptoms were improving with current medication. Plaintiff had reported diclofenac helps a lot. Plaintiff needed to get more active, work on weight loss, and exercise regularly. There was no worsening of disease overall and no new problems. (Tr. 549).

In December 2013, state agency non-examining consultant Dr. Richardson opined an RFC, which included medium work. (Tr. 88). In March 2014, at reconsideration, Dr. Knott, affirmed. (Tr. 101). Plaintiff reported to SSA that she stopped working in December 2011 because she was laid off.

3

(Tr. 356).

**2014**

On March 17, 2014, Plaintiff was seen by Dr. Patel. (Tr. 573). Plaintiff's weight was 219. (Tr. 574). Plaintiff reported pain in shoulder, hands, right hip, knee, and neck and fatigue. Plaintiff complained of right leg pain and occasional burning feeling around hip. (Tr. 574). Plaintiff had no joint swelling and no difficulty with activities of daily living. Plaintiff did not report headaches or anxiety. Diclofenac helped with stiffness; no associated redness or warmth was noted. (Tr. 575). Under review of systems, numbness was noted. Plaintiff reported walking some. (Tr. 575). Upon exam, Plaintiff was morbidly obese, in no acute distress, normal ambulation, normal motor strength, no edema, no swelling/tenderness of hands wrists/elbows, and full range of motion. (Tr. 575). Shoulders had full range of motion with no tenderness and no swelling. Feet and ankles were normal. Knees had crepitus and tenderness. Right hip was tender to palpation. (Tr. 576). Lumbar spine had paraspinal tenderness. Plaintiff had 12/18 tender points. (Tr. 576). Diclofenac and gabapentin were refilled for worsening fibromyositis. Multiple joint pain, obesity, and restless legs were stable. (Tr. 576). "OA pain is better and some paresthesias with her fibromyalgia." Plaintiff was to try a low dose of gabapentin. The need for regular exercise and diet was discussed. (Tr. 576).

On May 13, 2014, Plaintiff was seen by Dr. Burnett for knee pain. Plaintiff reported falling in April. Upon exam, Plaintiff's right knee had moderate effusion, diffuse medial tenderness, limited range of motion due to pain, mild crepitus, no edema, and antalgic gait. (Tr. 686). Meloxicam was started. (Tr. 686).

On May 21, 2014, Plaintiff was seen by Dr. Spurling of Florence Gastroenterology, complaining of nausea and burning. Given a negative "24 hour pH," it was likely not reflex. Dose

of proton pump inhibitor was increased. (Tr. 782). If no response to this, it may not be GI related and could be pain, anxiety, or medications. (Tr. 783). On follow up, reflux was controlled on increase. (Tr. 784). Insurance would not pay for twice day dosing; it was suggested to supplement with inexpensive over the counter. (Tr. 786). Plaintiff was sent for EGD imaging for GERD. (Tr. 795). Esophageal motility catheter procedure was essentially normal. (Tr. 803). Conclusion of barium swallow was hiatal hernia and patulous distal gastroesophageal junction. (Tr. 805).

In June 2014, Plaintiff was seen by Dr. Burnett, complaining of an acute exacerbation of asthma, seen at urgent care three days prior. Plaintiff was improving. (Tr. 679). Upon exam, Plaintiff had scattered wheezing, coarse breath sounds, and mild bronchi. Plaintiff was to continue singulair, albuterol, and add asmanex. (Tr. 681).

On May 22, 2014, Plaintiff was reported falling on her right knee six weeks prior, worsening after taking a CPR class with lots of kneeling. Pain level was six. (Tr. 882). Gait was mildly antalgic. (Tr. 882). Plaintiff had mild crepitus. X-ray was normal. Physical therapy was prescribed. (Tr. 884). On June 20, 2014, Plaintiff was seen by Dr. Runyan of Pee Dee Orthopaedic for right knee contusion and bursitis follow up. Plaintiff reported she was essentially pain free and had been doing physical therapy and home rehabilitation. (Tr. 880). Weight was 189. (Tr. 880). Symptoms had resolved; follow up was only to be as needed. (Tr. 881).

On July 24, 2014, Plaintiff was seen by Dr. Patel. Review of systems and history was similar to March 2014 visit. (Tr. 580-581). Diclofenac helped with stiffness; legs and feet burned but with no swelling noted. There was some improvement with motion and trying to walk. Plaintiff was tolerating her medications well. (Tr. 581). Upon exam, Plaintiff was morbidly obese, in no acute distress, tender neck, normal ambulation, abnormal sensation in legs, normal mood, trace edema in

musculoskeletal, no swelling/tenderness of hands wrists/elbows, and full range of motion. (Tr. 581). Shoulders had full range of motion with no tenderness and no swelling. Feet and ankles were normal. Knees had crepitus and tenderness. Right hip was tender to palpation. (Tr. 581). Lumbar spine had paraspinal tenderness. Plaintiff had 11/18 trigger points. (Tr. 582). Gabapentin was increased for uncontrolled fibromyositis. Multiple joint pain, obesity, and restless legs were stable. Plaintiff needed to exercise and work on weight loss. (Tr. 582).

On August 5, 2014, Plaintiff was seen by Dr. Burnett complaining of still having headaches. (Tr. 671). Intensity of headache was mild/moderate; frequency was daily. (Tr. 671). Upon exam, Plaintiff was in no acute distress, with normal gait, and appropriate mood. (Tr. 672). Bupap was stopped and Butalbital started. (Tr. 673). In July, Plaintiff was seen for a headache lasting three days; Tylenol helped a little but the headache came right back. (Tr. 676). Medication provides 50% relief. (Tr. 676). Exam was normal. (Tr. 678). Bupap was prescribed and a ketorolac injection given. (Tr. 678).

On November 20, 2014, Plaintiff was seen by Dr. Patel. (Tr. 584). History and review of systems were similar to prior visit, but with addition of morning stiffness for less than 10 minutes, exercise intolerance, and some tissue pain/burning reported. (Tr. 586). Some walking helps. (Tr. 586). Exam was similar to July visit, except with the addition of tenderness in hands with no synovitis and 10/18 trigger points. (Tr. 587). Fibromyositis was listed as uncontrolled; last gabapentin increase was too much and needed to be slower. Ropinrole was prescribed. Obesity was stable and weight loss was encouraged. Plan for multiple joint pain was NSAIDs and stay active. (Tr. 587). The need for regular exercise and diet was discussed. (Tr. 587).

**2015**

In February 2015, Plaintiff was seen by APRN Gulledge of the same clinic as Dr. Shelton for shoulder and elbow pain/discomfort, starting three days prior. (Tr. 648). Review of systems was positive for left arm elbow pain, muscle, and joint pain. Upon exam, Plaintiff appeared mildly ill and had limited range of motion of left shoulder with pain. (Tr. 649). Prednisone and Cymbalta were prescribed. (Tr. 650).

In March 2015, Plaintiff was seen by APRN Gulledge. (Tr. 645). Plaintiff reported Cymbalta was working well for discomfort. Plaintiff's complaint of pain with stiffness was much improved but had pain with lifting, throwing, and into arm. (Tr. 645). Review of systems was negative for muscle/joint pain. Upon exam, Plaintiff appeared mildly ill. Plaintiff had limited range of motion of left shoulder with pain. Cymbalta was increased. (Tr. 646).

On September 29, 2015, Plaintiff was seen by Dr. Patel. (Tr. 589). Weight was 235 pounds. (Tr. 590). Plaintiff reported getting medications from primary provider. Plaintiff was on Cymbalta and Mobic now. Plaintiff reported her orthopedic stated her knee cap was out of place. Plaintiff continued to report pain, morning stiffness, and fatigue. "No anxiety" was listed. (Tr. 591). Plaintiff had no edema. Upon exam, Plaintiff was morbidly obese. Plaintiff had normal ambulation, normal mood, tender neck, abnormal sensation in legs, trace edema, tenderness in hands, normal in wrists, elbows, shoulders, feet, and ankle, tenderness to palpation of right hip, and paraspinal tenderness. (Tr. 592). Plaintiff had 11/18 trigger points. Fibromyositis was listed as stable still with symptoms; Gabapentin was increased. (Tr. 592). Obesity was stable; Plaintiff needed to work on weight loss. (Tr. 592).

On November 30, 2015, Plaintiff was seen by Dr. Shelton. Response to hypertension medication was good. Medications controlled GERD symptoms. Plaintiff had URI. Weight was 236.

Exam was normal in categories other than respiratory. (Tr. 637). Panic disorder was listed in assessments. Under "others," diclofenac, gabapentin, Cymbalta, and Bupap were listed. (Tr. 638). Plaintiff had a similar visit in July 2015. (Tr. 641-642).

**2016**

On January 11, 2016, Plaintiff was seen by Dr. Runyan for left knee patellofemoral pain. Plaintiff reported significant improvement and no significant pain at that time. Injury date listed was April 2014. (Tr. 870). In December 2015, Plaintiff reported increased pain, worse with stairs. She had been wearing her brace and doing home rehabilitation. Plaintiff rated pain at 7. (Tr. 872). Gait was antalgic. (Tr. 872). Plaintiff had mild crepitus. Plaintiff was to continue home rehabilitation and brace. An injection was given. (Tr. 874). In September 2015, Plaintiff rated pain as 0 with some ongoing soreness as to left knee. (Tr. 875). In August 2015, Dr. Runyan noted knee pain had been present for about three weeks with no significant swelling. Pain rated at 6. (Tr. 877). Gait was normal. Plaintiff had moderate crepitus. Plaintiff was prescribed Mobic and a brace. (Tr. 879).

On February 17, 2016, Plaintiff was seen by Dr. Runyan for right knee MCL sprain. Plaintiff reported mild soreness and significant improvement. She rated pain at two. Plaintiff denied catching, locking, or giveaway. (Tr. 863). Plaintiff was doing home rehabilitation program. On February 25, Plaintiff twisted her right knee the prior day, landed on it, and heard a pop. Pain level was 6. (Tr. 867). Plaintiff reported under the review of systems, diabetes, joint swelling/stiffness, aches, and asthma. (Tr. 867). Plaintiff had antalgic gait. Imaging was normal. Diagnosis was a sprain; ibuprofen and a knee immobilizer were given. (Tr. 869). On March 9, a similar visit occurred, with knee doing better than previously. Pain was three. (Tr. 865). Upon exam, there was trace effusion, mild medial tenderness with palpation, and moderate medial laxity. (Tr. 865).

In February 2016, Plaintiff reported to Pee Dee Surgical Group that her occupation was homemaker and her hobbies were "gym." (Tr. 611). Plaintiff's chief complaint was GERD. (Tr. 612). Imaging showed hiatal hernia and patulous distal gastroesophageal junction. (Tr. 1207). Operation was recommended. Upon exam, Plaintiff had full range of motion of extremities and was in no distress. (Tr. 615). Operation was scheduled for May 25, 2016 with Dr. Player. (Tr. 618). Extremities and neurological exam were normal. (Tr. 618). Review of systems was negative for muscle/joint pain. (Tr. 633).

On April 4, 2016, Plaintiff was seen by Dr. Shelton complaining of headache pressure like sensation with ear pain. Upon exam, Plaintiff was in no acute distress and was pleasant.  Exam was normal for extremities. Judgment and insight were appropriate. (Tr. 631). On April 6, 2016, Plaintiff was seen for sinus issues by Dr. Shelton. Exam was normal in all other categories. (Tr. 634).

On April 6, 2016, Plaintiff was seen by Dr. Runyan. Plaintiff reported significant improvement of right knee mcl sprain with pain level zero to two. (Tr. 1143). Plaintiff's weight was 210. Follow up was to be as needed. (Tr. 1144).

On April 26, 2016, Plaintiff was seen by Dr. Shelton. (Tr. 628).  Plaintiff complained of dizziness that started a week prior. Plaintiff reported she was stressed studying for a major test. Upon exam, Plaintiff was in no acute distress and was pleasant.  Extremities exam was normal. (Tr. 628). Judgment and insight were appropriate. Review of systems was negative for muscle/joint pain. (Tr. 630).

On May 23, 2016, Plaintiff was seen by Dr. Patel. (Tr. 594).  Plaintiff reported similar complaints as the last 2015 visit. (Tr. 596-597). Upon exam, Plaintiff was morbidly obese. Plaintiff had normal ambulation, normal mood, tender neck, abnormal sensation in legs, mild edema,

tenderness in hands, normal in wrists, elbows, shoulders, feet, and ankle, tenderness to palpation of right hip, paraspinal tenderness, and tenderness and crepitus in knees. (Tr. 598). Plaintiff had 10/18 trigger points. Multiple joint pain was listed as stable with diclofenac and no side effects. Fibromyositis was listed as stable with "still mildly symptoms." Gabapentin was increased to 300 mg. Plaintiff needed to exercise regularly and diet. (Tr. 598). Plaintiff weighed 249 pounds. (Tr. 596).

On May 24, 2016, Plaintiff was seen by Dr. Shelton. (Tr. 624). Hypertension responded well to medication with no side effects. Plaintiff was exercising. Plaintiff complained of recurring panic attacks with overwhelmed, anxious mood. Plaintiff requested Xanax for as needed use only. Weight was 249 pounds. Upon exam, Plaintiff was in no acute distress and was pleasant. Extremities exam was normal. (Tr. 624). Judgment and insight were appropriate. Xanax was prescribed. (Tr. 625). Cymbalta was refilled for chronic pain. (Tr. 625). Review of systems was negative for joint pain and headaches and positive for anxiety. (Tr. 626).

In June 2016, Dr. Patel completed a form, but page 4 of 5 was not submitted. (Tr. 567). He saw her every three months. She met the FM criteria. She had other impairments of RLS and vitamin D deficiency. (Tr. 564). Prognosis was good. He answered "no" on whether Plaintiff's impairments had lasted 12 months or were expected to last 12 months. Under the question "identify findings," he answered "no inflammatory arthritis." (Tr. 564). Symptoms were multiple tender points, non-restorative sleep, chronic fatigue, numbness and tingling, myofascial pain syndrome, and multiple trigger points. (Tr. 564-565). Plaintiff had pain in cervical, hands/finger, hips, leg, and knees. Plaintiff did not have pain in shoulders, arms, ankles, or feet. (Tr. 565). Pain was mild and improved with medication. (Tr. 565). Fatigue precipitated pain. Emotional factors did not contribute

10

to severity of symptoms and limitations. Plaintiff's pain was seldom sufficiently severe to interfere with attention and concentration. (Tr. 565). Plaintiff had a slight limitation in ability to deal with work stress. Plaintiff had no medication side effects. Plaintiff could walk 3-4 blocks without rest or severe pain. (Tr. 566). Plaintiff could continually sit, stand, or walk at one time, 4 hours. Plaintiff did not need to shift positions at will. Plaintiff did not need to lie down. Plaintiff did not need elevation. Plaintiff did not need an assistive device. (Tr. 566).

On June 29, 2016, Plaintiff was seen by Dr. Shelton. (Tr. 621). Exam was normal for all categories with no edema or distress. (Tr. 621).

In June 2016, Dr. Shelton completed a form. (Tr. 568). Plaintiff first began treating with Dr. Shelton in July 2015. Plaintiff was seen about every two months. (Tr. 568). Prognosis was poor. Plaintiff's impairments could be expected to last 12 months. Plaintiff could stand/walk 0-2 hours each total in a workday. Plaintiff could occasionally lift less than 10 pounds and 10 pounds. Plaintiff could occasionally finger/grasp, rarely handle/bend, and never crouch. (Tr. 568). Plaintiff's pain would frequently be severe enough to interfere with attention and concentration to perform even simple work tasks. (Tr. 568). Plaintiff would be absent more than four days a month. (Tr. 568).

On September 13, 2016, Plaintiff was seen by Dr. Player for GERD and hernia. (Tr. 885). Plaintiff had been scheduled for surgery the next day. There were some findings on workup that would lead to high risk of failure, which was in part due to morbid obesity. Plaintiff was relieved not to go forward with operation. Weight loss was first choice of management and Carafate prescribed. Bariatric surgery may need to be considered before any hernia repair. (Tr. 885). Inapposite, there is a signed assessment on September 14 that Plaintiff was undergoing operative intervention for hernia. (Tr. 890).

11

On September 20, 2016, Plaintiff was seen for weight loss/gain by Dr. Shelton. Plaintiff had lost 14 pounds. Plaintiff requested Adipex. Plaintiff's weight was 238. Exam was normal. Under "Assessments," Xanax was refilled for panic disorder and BritalbitalAPACaffeine for headaches. (Tr. 1301).

On October 3, 2016, was seen by Dr. Dickinson of McLeod Urgent care for asthma exacerbation. Upon exam, Plaintiff had expiratory wheezes and congestion. Prednisone and an antibiotic for rhinosinusitis was prescribed. (Tr. 977-978).

On October 9, 2016, Plaintiff was seen in the emergency room for shortness of breath. (Tr. 939). Onset was one day prior and mild. (Tr. 940). Plaintiff reported no back pain, headache or anxiety. Upon exam, Plaintiff was nontender with normal range of motion. Plaintiff had minimal wheezing with non-labored respirations. (Tr. 942). Impression was asthma exacerbation. (Tr. 942). Plaintiff weighed 197 pounds. (Tr. 943).

On November 1, 2016, Plaintiff was seen by Dr. Shelton for weight loss/gain. (Tr. 1298). Weight was 227 pounds. (Tr. 1298). Exam was normal. Plaintiff was exercising 3-4 times a week for 30-60 minutes. (Tr. 1298). Adipex was refilled.

On November 3, 2016, Plaintiff was seen by Dr. Patel. (Tr. 894). Plaintiff weighed 229 pounds. (Tr. 895). Plaintiff reported shoulder, hand, knee, and neck pain mild to moderate. Plaintiff reported fatigue and morning stiffness. Upon exam, Plaintiff had normal ambulation, tender neck, tender calves, no edema, normal hands/wrists, elbows, shoulders, ankles, crepitus and tenderness in knee, and paraspinal tenderness with 11/18 trigger points. (Tr. 897). Fibromyositis was listed as stable, still mild symptoms; gabapentin was increased. Plaintiff was advised to exercise regularly. Multiple joint pain was stable and no NSAIDs because of GI symptoms. (Tr. 897).

12

On December 1, 2016, Plaintiff was seen by Dr. Shelton for weight gain/loss. (Tr. 996, 1295). Plaintiff was compliant with diet and exercised 3-4 times a week. Plaintiff weighed 223 pounds. Exam was normal. Adipex was refilled. Plaintiff was to continue cardio and strength training. (Tr. 997). On November 1, Plaintiff was seen for the same. Plaintiff weighed 227 pounds. Visit notes were otherwise similar. (Tr. 999-1000). On September 20, 2016, Plaintiff was seen for the same and reported Plaintiff was encouraged to lose weight by Dr. Player instead of hernia surgery. Plaintiff reported "jog/run" 30-60 minutes a day. (Tr. 1001). Exam was normal. Xanax was continued for panic disorder. Adipex was refilled. Butalbital for headaches was refilled. (Tr. 1002).

**2017**

On January 10, 2017, Plaintiff was seen by Dr. Shelton for panic attacks. (Tr. 992). Plaintiff reported significant benefit with Xanax. Plaintiff reported depressed, anxious, irritable mood. Plaintiff reported being worried about everything and crying regularly with sleep problems and decreased energy/concentration. Plaintiff denied counseling in reports. (Tr. 992). Under review of systems, Plaintiff was negative for muscle/joint pain, headaches, depressed mood, and breathing problems and positive for panic attacks. (Tr. 994). Upon exam, Plaintiff was pleasant and in no acute distress. Plaintiff had no edema with appropriate judgment/insight. Plaintiff was referred to counseling. Trazodone was prescribed, and Xanax refilled. (Tr. 994, 1293).

On February 13, 2017, Plaintiff was seen by Dr. Runyan for right knee pain. Plaintiff when last seen in April 2016 was doing well. Plaintiff reported increased pain over the last two weeks with catching and locking.  Plaintiff reported using ibuprofen and a pain level of 6. (Tr. 1140). Upon exam, gait was mildly antalgic. Plaintiff had trace effusion, mild medial laxity, mild quadriceps inhibition, and mild lateral tenderness. (Tr. 1141). Plaintiff was prescribed 800mg ibuprofen and

received an injection. (Tr. 1142).

On March 2, 2017, Plaintiff was seen by Dr. Patel. (Tr. 1317). Plaintiff reported fatigue, less than 10 minutes of morning stiffness, tingling membrance, asthma, and migraines. (Tr. 1319). Plaintiff ambulated normally, had tender calves, mild edema, tenderness of hands, knee crepitus/tenderness, hip tenderness, and paraspinal tenderness. There were 11/18 trigger points. (Tr. 1320. FM assessment was doing well and trying to stay active on gabapentin and Cymbalta. (Tr. 1320). Clinically appeared to have carpal tunnel; NCV needed to be checked. (Tr. 1321).

On March 13, 2017, Plaintiff was seen by Dr. Runyan for right knee. (Tr. 1138). Plaintiff reported significant improvement with less pain at level three with no catching or locking. (Tr. 1138). Plaintiff was improved clinically at that time; follow up was to be as needed and activity as tolerated. (Tr. 1139).

On March 15, 2017, Plaintiff was seen for weight loss/gain. Plaintiff was complying and making progress, but exercise was limited due to knee pain. (Tr. 1286). Exam was normal. Adipex was refilled. Plaintiff was to adhere to cardio and strength exercising. (Tr. 1287).

On April 11, 2017, Plaintiff was seen by Dr. Shelton. (Tr. 1280). Plaintiff presented with stable panic attacks on Cymbalta, Xanax, and Trazodone. Counseling had not started yet. Plaintiff had stressors from family death and pain. Plaintiff had anxious/overwhelmed mood. As to hypertension, Plaintiff was not exercising and response to medication was good. It is noted she sees Dr. Patel for FM. (Tr. 1280). Exam was normal in all categories. Xanax was refilled. (Tr. 1282).

On April 20, 2017, testing showed mild carpal tunnel and no radiculopathy. (Tr. 1326).

On April 25, 2017, Plaintiff was seen by Dr. Spurling for GERD. (Tr. 1188). Plaintiff had not been seen in a year. Plaintiff could not have surgery because her motility showed her pressures

were not adequate. Plaintiff reported cramping and heartburn. (Tr. 1188). Review of systems showed no joint pain/swelling. (Tr. 1191). Exam was normal. Medication was changed to twice a day. (Tr. 1191).

On May 22, 2017, Plaintiff was seen by Dr. Shelton as a walk-in for headaches. Plaintiff reported her headache began two weeks prior in the center of her forehead, three times a week, 10-30 minutes in duration with neck pain, nausea, sinus pressure, and runny nose. Ibuprofen 800mg helped the most; medication provided 50-60% relief. (Tr. 1277). Upon exam, Plaintiff had sinus tenderness. (Tr. 1277). Bactrim was started for recurrent sinusitis. (Tr. 1278).

On May 30, 2017, Plaintiff was seen by Dr. McKay for intermittent moderate to severe headaches primarily frontal, worse on the right side, and associated with photophobia. (Tr. 1157). Plaintiff was negative for anxiety and fatigue. (Tr. 1158). Exam was normal. Plaintiff intermittently used BuPAP for migraines. Imitrex was prescribed; if headaches persisted, imaging would be ordered. (Tr. 1160).

On June 1, 2017, Plaintiff was seen by NP Felder of Carolina Rheumatology. (Tr. 1007, 1313). Plaintiff weighed 210 pounds. Plaintiff reported morning stiffness for 10 minutes, tingling membrance, irregular sleep, history of carpal tunnel, migraine, and depression. Plaintiff reported splints and injections in the past were not effective. Plaintiff reported her legs were still bothering her and the bottom of her feet were burning. Plaintiff had started Imitrex for migraines. (Tr. 1009). Plaintiff reported using Adipex and treadmill for 25 minutes. Plaintiff reported depression and therapy every Wednesday. Plaintiff reported fatigue, myalgia, numbness, and paresthesia. Upon exam, Plaintiff ambulated normally.  Plaintiff had tender neck, abnormal leg sensation, mild edema, and tenderness in hands, normal exam in wrists, elbows, shoulders, feet, and ankles, crepitus and

tenderness in left knee, tender to palpation of hip, and paraspinal tenderness. (Tr. 1010). Plaintiff received a carpal injection. Medications were listed as no side effects. (Tr. 1010).

On June 6, 2017, Plaintiff was seen by PA Kebede. Plaintiff reported no symptoms while on two medications for GERD. (Tr. 1186). Panic disorder was noted in assessment with no other notes regarding. (Tr. 1186).

On June 20, 2017, Plaintiff was seen by Dr. Shelton as a walk-in for anxiety. (Tr. 1274). Plaintiff reported Cymbalta and Xanax helped with panic attacks and counseling weekly helped some. Plaintiff reported more frequent panic attacks. Plaintiff complained of anxious, overwhelmed mood with sleep disturbance, and decreased energy/concentration. (Tr. 1274). Weight was 213 pounds. (Tr. 1274). Exam was normal in all categories, except flat/anxious affect. (Tr. 1275). Seroquel was prescribed. (Tr. 1275). Review of systems showed Plaintiff was negative for joint pain and headaches. (Tr. 1276).

On June 30, 2017, Plaintiff was seen by Dr. McKay for headache. Plaintiff reported the recently prescribed Imitrex was working. (Tr. 1162). Follow up was to be six months. Plaintiff was responding well to Imitrex. (Tr. 1165).

On July 31, 2017, Plaintiff was seen by Dr. Shelton for headaches that were worsening, daily, over the right eye and cheek, moderate to severe in intensity, frequency of daily times two weeks, and duration 2-3 weeks. (Tr. 1271). Exam was normal in all categories. Assessment was intractable migraine without aura and with status migrainosus. Plaintiff was prescribed Relpax and Propranolol extended release. A Toradol injection was given. (Tr. 1272).

On July 31, 2017, Plaintiff was seen by Dr. Patel. (Tr. 1309). Similar reports and exams as visits near in time were noted. (Tr. 1311-1312). Plaintiff reported using a treadmill for 20 minutes

16

and having counseling every Wednesday. (Tr. 1312). Plaintiff had 14 trigger points. Under assessment of FM, medication seemed to be helping, but she was not able to exercise. Plaintiff was referred to PT. (Tr. 1313, 1011). The need for regular exercise and weight loss was discussed. (Tr. 1313).

On August 31, 2017, Plaintiff was seen by Dr. McKay. Plaintiff continued to report Imitrex was working for migraines. (Tr. 1167). It was continued. (Tr. 1170). The same was reported on September 21. (Tr. 1172).

On September 7, 2017, Plaintiff was seen by PA Kebede of Florence Gastroenterology. (Tr. 1183). Plaintiff reported taking medication with reflex symptoms controlled. For the prior month, she has nausea a few times a week. (Tr. 1183). Upon exam, Plaintiff was tender in multiple quadrants of gastrointestinal with likely positive Murphy sign. (Tr. 1183). Plan was to continue Prevacid for GERD and work up nausea for possible gallbladder disease. (Tr. 1184). October gallbladder imaging was normal. (Tr. 1202).

On October 16, 2017, Plaintiff was seen by Dr. Runyan. (Tr. 1119). Plaintiff reported significant improvement after February right knee injection, then the last two weeks, she had increased pain. Plaintiff reported taking ibuprofen and a pain level of 6. (Tr. 1119). Review of systems noted difficulty walking and joint pain/stiffness and no numbness/weakness. Weight was 195 pounds. (Tr. 1120). Upon exam, gait was mildly antalgic, impaired squat, trace effusion, mild quadriceps inhibition, tenderness, and positive McMurray's test. (Tr. 1121). An injection was given again and activity was as tolerated. Plaintiff did not have significant mechanical symptoms. (Tr. 1121).

On November 30, 2017, Plaintiff was seen by NP Felder for FM and joint pain. (Tr. 1305).

Plaintiff reported fatigue, 30 minutes of morning stiffness, tingling membrance, irregular sleep, history of carpal tunnel, migraine, and depression. Plaintiff continued gabapentin and Cymbalta with some joint pain without side effects; right knee injection was last month. Plaintiff had some trouble with carpal tunnel and was not using splints. (Tr. 1308). Upon exam, Plaintiff was in no acute distress. Plaintiff had normal ambulation, normal affect, tender neck, abnormal leg sensation, mild edema, mild tenderness in wrists, tender to palpation of elbows and shoulder, knee crepitus and tenderness, tender hips, and paraspinal tenderness. It was noted PT was not effective; gabapentin was increased. (Tr. 1309).

On December 13, 2017, Plaintiff was seen by Dr. Runyan for right knee pain. (Tr. 1115). Plaintiff only had minimal improvement from the prior injection. Plaintiff reported pain worse with ambulation and stairs and had giveaway. Plaintiff has been wearing a knee brace. Plaintiff's pain level was 6. (Tr. 1115). Review of systems noted no muscle/joint pain, no joint stiffness/swelling, no numbness/tingling/weakness, and no difficulty walking. (Tr. 1116). Weight was 207. (Tr. 1117). Upon exam, Plaintiff had antalgic gait, trace effusion, tenderness, patellar grind, and moderate medial laxity. MRI showed full thickness chondral fissuring along the medial patellar facet with fluid signal along the undersurface of the cartilage concerning for small chondral flap tear, small partial thickness chondral defect of the trochlea, and reactive edema and geodes appreciated in the osseous structures. (Tr. 1137).

## 2018

On January 12, 2018, Plaintiff was seen by Dr. Runyan for right knee pain. Plaintiff reported ibuprofen and ice use and pain level of 7. (Tr. 1111). Plaintiff reported weakness, joint pain, swelling, and stiffness but no difficulty walking. Assessment was chondral defect and

18

chondromalacia of right patella. (Tr. 1113). Plaintiff was referred to Dr. Alan.

On February 16, 2018, Plaintiff was seen by Dr. Alan for right knee pain. Plaintiff reported worsening pain and difficulty with stairs. Upon exam, Plaintiff had normal mood/affect and no edema. Plaintiff's right knee had positive patellofemoral grind, positive theater sign, positive patellar apprehension, and full range of motion. (Tr. 1014, 1108). Diagnosis was osteoarthritis of right knee. Replacement was recommended; Plaintiff agreed with surgery. (Tr. 1015). For surgery preparation, Plaintiff reported she had not used her rescue inhaler in more than a month and her last asthma attack was in June 2017. (Tr. 1019). Plaintiff had right knee surgery on March 15, 2018. (Tr. 1020). Imaging was normal. (Tr. 1133).

On March 9, 2018, Plaintiff presented to emergency room for left ankle pain after tripping over a baseball bat and falling. (Tr. 1229). Plaintiff reported no other symptoms. (Tr. 1229). Imaging was normal. (Tr. 1230). Plaintiff denied inability to bear weight. (Tr. 1240). Plaintiff was prescribed 800mg ibuprofen. (Tr. 1242).

In March 2018, Dr. Alan noted right quad was weak and after staples were removed Plaintiff needed assistance aid until full quad control. (Tr. (Tr. 1105). Imaging was normal. (Tr. 1129).

In April 2018, Plaintiff had physical therapy for right knee pain. (Tr. 1025). Plaintiff reported continued difficulty bending her knee. Plaintiff ambulated with a rolling walker. Plaintiff rated pain at 7. (Tr. 1025). Hobby listed was working out. (Tr. 1026). Upon exam, Plaintiff had tenderness. Plaintiff had slow, antalgic gait. Walking two blocks was marked as extreme difficulty. (Tr. 1026). On the second visit, Plaintiff reported pain level of 6 and doing better since starting exercises. (Tr. 1029). On April 13, Plaintiff reported 0 pain level and that she has been working a lot on bending her knee. (Tr. 1031). Plaintiff had improved demonstration of knee flexion range of motion. (Tr.

1032). The next visit, Plaintiff reported a pain level of 6; after exercises at the visit, her pain level was 3. (Tr. 1034).  On April 20, Plaintiff had a pain level of 4. At the next visit, Plaintiff reported her knee would not stop buckling and pain level was 3. (Tr. 1038). On April 28, Plaintiff reported her knee was still buckling and her doctor wants it to bend on her. Pain level was three. (Tr. 1040). Plaintiff was progressing in goals as expected. (Tr. 1041). On April 30, Plaintiff first drove and stated she is trying to get her knee to bend, but it is frustrating. Pain level was two.  (Tr. 1042). Plaintiff had gait training with improvement and was feeling more confident. Pain level was zero after session. (Tr. 1043).

In April 2018, Plaintiff was seen by Dr. Alan after right knee surgery. Pain was improving. Plaintiff walked with a slight limp using a walker. Imaging was normal. Plaintiff had weakened quadriceps. (Tr. 1099). Imaging was normal.(Tr. 1127).

In May, Plaintiff was progressing well toward goals and had improved knee range of motion but would benefit from further physical  therapy. (Tr. 1047). On May 11, Plaintiff was ambulating with a single point cane but denied pain and listed hobbies as working out. (Tr. 1049). Objective was tenderness to superior aspect of right knee and minimal edema. (Tr. 1049). Plaintiff had a little bit of difficulty with usual daily activities. (Tr. 1050). On May 14, Plaintiff reported zero pain level. Plaintiff progressed with the exercising, which included recumbent bike. (Tr. 1054). At the next visit, Plaintiff reported doing well with zero pain level and was trying to bend her knee more but reported her doctor may decide to do a manipulation in June.  (Tr. 1056). At the May 22 visit, Plaintiff reported decreased buckling when ambulating and pain level of zero. Plaintiff used the treadmill for eight minutes at 1.0 mph. (Tr. 1058). Visits continued in a similar fashion. (Tr. 1060-1069). Plaintiff was discharged on June 12 as she was doing well and her orthopedist released

20

her. She denied any pain or recent buckling. (Tr. 1070). There was no difficulty with usual daily activities or walking between rooms. There was no difficulty walking 1 mile. (Tr. 1071). Plaintiff met all goals. (Tr. 1072).

On June 6, 2018, Plaintiff was seen by Dr. Alan for right knee. Plaintiff had normal gait and was able to squat. Imaging was normal. Plaintiff was to return in one year. (Tr. 1098-99, 1125).

On July 2, 2018, Plaintiff was seen by NP Felder for foot and joint pain. (Tr. 1302). Plaintiff reported shoulder pain, foot pain, and left elbow pain that started two months prior. (Tr. 1302). Plaintiff reported fatigue, 30 minutes morning stiffness, tingling membrance, irregular sleep, history of carpal tunnel, migraine, and depression. Plaintiff tolerated gabapentin and Cymbalta well. Plaintiff ambulated with a cane after knee surgery. Plaintiff reported foot pain was hard to walk on. Plaintiff reported exercise intolerance. (Tr. 1304). Upon exam, Plaintiff was in no acute distress. Plaintiff had normal ambulation, normal affect, tender neck, abnormal leg sensation, mild edema, mild tenderness in wrists, tender to palpation of elbows and shoulder, tender feet, right knee crepitus and tenderness, tender hips, and paraspinal tenderness. (Tr. 1305). Plaintiff had last been seen for FM in November 2017. Imaging for ankle and feet pain showed tiny calcanea enthesophytes plantar fascial origins with mild Achilles tendon insertional calcification. (Tr. 1244). Plaintiff was seen in the emergency room on July 7 for heel pain and reported onset of one week prior. (Tr. 1248). Upon exam, Plaintiff had point tenderness on heels. (Tr. 1250). Plaintiff had calcaneal spur; Naprosyn 500mg was prescribed. (Tr. 1251).

On July 18, 2018, Plaintiff was seen for "new" problem of left knee pain by Dr. Alan with swelling. Symptoms were not relieved with Tylenol. Weight was 223. (Tr. 1094). Upon exam, Plaintiff had tenderness, positive grind, antalgic gait, and positive theater sign. (Tr. 1094).

21

Meloxicam and therapy were prescribed. (Tr. 1095). Imaging showed very small osteophyte on patella. (Tr. 1123).

In July 2018, Plaintiff had physical therapy on her left knee after a spur was found on her knee cap. She had antalgic gait and difficulty with steps. (Tr. 1074). Upon exam, Plaintiff had tenderness with mild limitations in range of motion and strength. (Tr. 1075). Pain level was a 4 at the next visit. (Tr. 1078). On July 31, pain was a 5. (Tr. 1081). On August 2, Plaintiff reported a pain level of 7 with repetitive movement but zero at rest. (Tr. 1082). Pain reassessment after session was zero. (Tr. 1083). Similar visits continued, until Plaintiff was discharged secondary to goals having been met and Plaintiff was independent in home exercise. (Tr. 1084-1093).

On August 24, 2018, Ms. Lobo completed a statement. Weekly contact was from 4/25/17 to 7/5/17 and from 6/6/18 to the present. Diagnosis were panic disorder, insomnia, and generalized anxiety disorder. Plaintiff had made moderate progress in therapy and attended consistently. (Tr. 1263). Prescribed medication was n/a. "[T]his clinician has observed severe levels of anxiety and frequency of panic attacks." (Tr. 1263). Symptoms were loss of interest in almost all activities, decreased energy, feeling of guilt/worthlessness, generalized persistent anxiety, somatization unexplained by organic disturbance, mood disturbance, difficulty thinking/concentrating, recurrent and intrusive recollection of a traumatic experience, which are a source of marked stress, pathological dependence, persistence disturbances of mood/affect, apprehensive expectation, paranoid thinking, emotional withdrawal isolation, persistent irrational fear of a specific object, activity, or situation, sleep disturbance, recurrent severe panic attacks manifested by sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring at least once a week, vigilance, illogical thinking, maladaptive behavior patterns, and perception

22

disturbances. (Tr. 1264). Plaintiff was seriously limited but not precluded from maintaining attention for two hours, accepting instructions and responding appropriately to criticism from supervisors, responding appropriately to changes in routine work setting, dealing with normal work stress, and awareness of hazards. (Tr. 1265). Plaintiff was unable to meet competitive standards for work in coordination with or proximity to others without being unduly distracted, complete a normal workday/week without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, and get along with coworkers without unduly distracting them or exhibiting behavioral extremes. (Tr. 1265). Written in was Plaintiff had severe body ache complaints that might prevent her ability to meet standards and she suffers from consistent panic attacks and anxiety, particularly when in the presence of others. (Tr. 1265). Plaintiff had limited but satisfactory ability to understand/remember/carry out detailed instructions. Plaintiff was seriously limited but not precluded from setting goals independently of others and dealing with stress of skilled work. (Tr. 1266). Plaintiff was unable to meet standards for interacting with public, maintaining appropriate behavior, and using public transportation. (Tr. 1266). Written in was Plaintiff often complains of pain in joints, feet, and knees, which might be worse under situations provoking stress and anxiety. (Tr. 1266). Plaintiff would be absent more than 4 days a month and impairment lasted at least 12 months.

On October 15, 2018, Plaintiff was seen by Dr. Farricelli. (Tr. 1335). Plaintiff reported pain beginning five years prior in her knee and shoulder after she was diagnosed with FM. Pain level with medications was 6. Plaintiff reported pain was worsened by sitting for long, bending, and lifting. Plaintiff reported pain improved after March 2018 knee surgery until August 2018. Plaintiff reported swelling. Weight was 222. Exam was antalgic gait, normal attention/concentration, and tenderness

and crepitus of both knees. Plaintiff had tenderness and limited range of motion of shoulder, positive Kennedy impairment, and positive Dawbarn's sign. (Tr. 1336). Plaintiff received a shoulder injection. (Tr. 1336). A similar visit occurred with PA Crisp on September 28. (Tr. 1338). Testing was done to consider prescribing opioids. (Tr. 1339). Plaintiff had normal NCV/EMG of lower extremities. (Tr. 1341). Plaintiff did not indicate headache on review of systems; she did note heartburn, joint pain/stiffness, anxiety, depression, insomnia, and panic attacks. (Tr. 1348-1349). Imaging of shoulder showed mild AC joint arthritis. (Tr. 1350). Plaintiff reported she never felt a need for higher doses of medication to treat her pain. (Tr. 1351).

### C.    The Administrative Proceedings

### 1.    The Administrative Hearing

#### a.    Plaintiff's Testimony

At the hearing on May 18, 2016, before ALJ James Howard Scott, Plaintiff requested to have an attorney present and a continuance was granted. (Tr. 80). At a hearing on June 28, 2016, her attorney had withdrawn at the last minute and additional evidence had become available. (Tr. 75). Another continuance was granted.

On February 15, 2017,  Plaintiff, represented by an attorney, appeared at a hearing. (Tr. 63). The alleged onset date was amended to September 18, 2013. (Tr. 63). Plaintiff testified she was unable to work because she has pain when she stands too long and fibromyalgia and it is in her shoulders. (Tr. 64). Plaintiff testified to constant pain in her shoulders that goes down her arms. Plaintiff also stated asthma. Plaintiff stated she has panic attacks every day, sometimes twice a day. Plaintiff reported medications make her sleepy; she must take a nap every day. (Tr. 64). Plaintiff uses her inhaler twice a day and takes medication for anxiety. Plaintiff was in the process of being set up

24

with a grief counselor. Plaintiff testified she had never seen a counselor before. (Tr. 64-65). Plaintiff's typical day is getting her sons ready, taking them to school, watching television, taking medications, taking a nap, then going to pick up her sons from school. Plaintiff does not cook where any standing is involved because of pain in her legs. (Tr. 65). There are days two to three times a week she must call someone for help to take the children to school because she cannot get out of bed. (Tr. 65). Plaintiff's panic attacks are triggered by having to be around people, meeting deadlines, or other "simple" things. (Tr. 65). Plaintiff testified she has headaches sometimes 3-4 times a week. (Tr. 66). Plaintiff takes Bupap for headaches and has not tried Imitrex yet. Bupap helps her headaches but puts her to sleep. (Tr. 66). Plaintiff's shoulder and hand pain prevents her from lifting things and she drops things. Her wrists hurt typing. When climbing stairs, her left knee gives out. (Tr. 66). Plaintiff can lift a half gallon of milk. (Tr. 67). Plaintiff tried exercise as recommended by her rheumatologist, but it only makes her hurt. (Tr. 67). Plaintiff shops for groceries with her sons. Plaintiff's sons help with parts of the laundry. Plaintiff does not go to church anymore due to crowds. Plaintiff's knee and shoulder pain is worse when it rains. (Tr. 68). Plaintiff is nauseated every day from a hernia. (Tr. 68). It hurts to reach overhead. (Tr. 69). Plaintiff has low blood sugar resulting in being confused and shaky. (Tr. 69).

Then, the ALJ stated he was not sure he was going to approve Plaintiff's claim and wanted her to see the counselor and go back to her treating providers to see if she could get something more specific about limitations. (Tr. 69-70). Plaintiff's attorney was given 60 days. (Tr. 60-70).

On November 15, 2018, Plaintiff, represented by an attorney, appeared before ALJ Nancy McCoy. (Tr. 33). It was noted the prior ALJ's decision had been remanded by the Appeals Council. (Tr. 36). Plaintiff testified she had been going maybe for a year to Wellspring Counseling with Ms.

25

Lobo. (Tr. 37). It was noted that treatment notes were requested from Wellspring not just a source statement. (Tr. 37). (The finalized record contains no supporting treatment notes). The ALJ noted it was not much use without supporting notes. (Tr. 37). The record was kept open 14 more days. Plaintiff's sons are ages 9 and 11. (Tr. 39). Plaintiff testified she had no problems driving, but she had not driven the last two months because of random anxiety attacks that she does not want to have while driving. Plaintiff last worked as a cashier in December 2012. (Tr. 41). Plaintiff testified she could not work due to chronic pain in her knees, shoulders, and feet due to fibromyalgia. Plaintiff cannot be around certain smells due to asthma. Plaintiff has anxiety attacks and headaches that come on at any time. (Tr. 43). Plaintiff takes Bupap for migraines. Plaintiff gets migraines sometimes three times a week. Medication makes her sleep and only by the second dose does it help. It lasts longer than 8 hours. Plaintiff hurts across her shoulders. She reports multiple joint pain and burning legs/feet. (Tr. 44). For such pain, she takes medications and goes to sleep. She still wakes up in pain. Walking a short distance has Plaintiff out of breath due to asthma. Plaintiff uses an inhaler three days a week. (Tr. 44-45). A typical day is Plaintiff's sons' grandmother takes them to school, then Plaintiff lies down because she is hurting, then wakes up, gets food, takes medication, it makes her sleep, she goes back to sleep, and wakes up in the afternoon when her children come home. She helps them with their homework in the bed because her knees hurt bad. She cooks dinner, something in the oven, and lies back down. (Tr. 45). Plaintiff's knee will lock up from sitting too long. (Tr. 46). Plaintiff testified she worked with the Wellspring counselor for her anxiety attacks and it is helping. (Tr. 46). Plaintiff used to take Seroquel and Cymbalta. Plaintiff takes Xanax. Plaintiff has side effects of drowsiness and headaches. Plaintiff stated she has carpal tunnel and drops things. Plaintiff testified her concentration is not good. (Tr. 47). Plaintiff had not been grocery shopping in the past

3 months. (Tr. 48). Plaintiff can stand for five minutes. (Tr. 49). Plaintiff controls hypoglycemia with diet. Plaintiff wakes up constantly at night. (Tr. 49). Plaintiff has two or more panic attacks in a day and takes Xanax twice a day. (Tr. 50). Plaintiff's counselor told her to deep breathe and try to ground herself when she feels an attack coming. (Tr. 50). Plaintiff sees Dr. Patel for FM every four months. (Tr. 50). Plaintiff testified physical therapy hurt worse. (Tr. 50). Plaintiff sees Felder at Patel's office. They help with feet problems and carpal tunnel. (Tr. 51). Plaintiff does not wear a splint for her wrist and injections helped a little. Plaintiff had her right knee replaced; physical therapy instead of replacement was recommended for her left knee. (Tr. 51). The ALJ asked why there was a year treatment gap in mental health. (Tr. 52). Plaintiff testified because she was told she was doing better. (Tr. 53). Plaintiff reported she had been taking Xanax for about a year and half from Dr. Shelton. (Tr. 53). Plaintiff testified Dr. Patel thought her feet pain and burning come from diabetes and she takes gabapentin. (Tr. 53).

### b.    Vocational Evidence

PRW was classified by the VE.  (Tr. 70). If limited to sedentary, PRW could not be performed. (Tr. 71). The ALJ told the attorney he was thinking about a return to full sedentary range of work, that it would be different if her age was different, but there were several things bothering the ALJ and he was giving them an opportunity to clean it up. (Tr. 71).

At the last hearing, the VE classified PRW. (Tr. 55-56). If a hypothetical individual could do light, except standing/walking 4 hours total out of work day, frequently use hand controls, occasionally climb ramps/stairs, never climb ladders/ropes/scaffolds, frequently balance, occasionally stoop/crouch/kneel/crawl, frequently handle/finger, avoid moderate exposure to excessive heat, humidity, wetness, dust, odors, gases, fumes, and pulmonary irritants, occasionally

interact with coworkers, no tandem or team activities, occasionally interact with public, no direct

customer service, occasionally interact with supervisors, no high speed task work or high quota

environment, and can adapt to routine changes, PRW was unavailable. (Tr. 57). Other work available

was small parts assembler, inspector and hand packager, and electronics worker. (Tr. 57-58). If

limited to stand/walk two hours, no work would be available. (Tr. 58). If absent more than 4 days

a month, no work was available. If occasional and not frequent handle/finger, no work would be

available. (Tr. 59).

### 2.    The ALJ's Decision

In the decision of January 31, 2019, the ALJ made the following findings of fact and

conclusions of law (Tr. 15-24):

1.    The claimant has not engaged in substantial gainful activity since September 18, 2013, the application date (20 CFR 416.971 *et seq.*).

2.    The claimant has the following severe impairments: osteoarthritis of the right knee and status post right knee patellofemoral replacement; fibromyalgia; asthma; a panic disorder; obesity; and bilateral carpal tunnel syndrome (20 CFR 416.920(c)).

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a range of light work as defined in 20 CFR 416.967(b) in that she can lift and carry up to twenty pounds occasionally and ten pounds frequently; stand and walk for about four hours in a workday; and sit for about six hours in a workday. She can frequently operate controls with her hands. She can frequently balance and occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs, but never climb ladders, ropes, or scaffolds. She must avoid moderate exposure to excessive heat, wetness, humidity, dusts, fumes, gases, odors, and other pulmonary irritants. She must avoid concentrated exposure to hazards such

as unprotected heights and moving machinery. Due to her mental impairment, she is further restricted in that she can understand and carry out only one and two-step tasks. She can occasionally interact with supervisors and co-workers, but cannot perform tandem or team style activities. She can occasionally interact with the general public but cannot perform direct customer service. She cannot perform high-speed tasks or work in a high quota environment. She is able to adapt to routine changes in a work setting and duties.

5.    The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.    The claimant was born on February 7, 1981, and was 32 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.    The claimant has more than a high school education and is able to communicate in English (20 CFR 416.964).

8.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10.    The claimant has not been under a disability, as defined in the Social Security Act, since September 18, 2013, the date the application was filed (20 CFR 416.920(g)).

## II. DISCUSSION

Plaintiff argues the ALJ did not properly evaluate the opinions of Dr. Patel and Shelton. (ECF No. 19 at 29). Plaintiff argues the Commissioner did not specifically address Plaintiff's other alleged severe impairments, including left patellofemoral pain, migraine headaches, depression, and anxiety with panic attacks. (ECF No. 19 at 24). Plaintiff argues the ALJ failed to consider any functional

limitations that may result from obesity, particularly sustaining function, walking/standing, pain, and fatigue. Plaintiff argues the RFC regarding light unskilled work is not supported by substantial evidence because of pain, standing, walking, and upper extremity limits. (ECF No. 19 at 26-27). Plaintiff argues the record does not support an RFC of ability to sustain a regular work week (ECF No. 19 at 28-29). Plaintiff argues the mental limitations given in the RFC ignores evidence of Plaintiff's panic attacks, social withdrawal, poor energy, and difficulty concentrating/thinking. (ECF No. 19 at 32-34). Plaintiff argues the ALJ ignored/minimized Plaintiff's pain and limitations from FM, joint pain, and fatigue and failed to follow SSR 12-2p. (ECF No. 19 at 28). The Commissioner argues the ALJ's determinations are supported by substantial evidence.

## A.    LEGAL FRAMEWORK

### 1.    The Commissioner's Determination–of–Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  Section 423(d)(1)(A) defines disability as: the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.  42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions.  *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting the "need for efficiency" in considering disability claims).  An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity ("SGA"); (2) whether

he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[1] (4) whether such impairment prevents claimant from performing PRW;[2] and (5) whether the impairment prevents him from doing SGA.  *See* 20 C.F.R. § 404.1520.  These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis.  If a decision regarding disability may be made at any step, no further inquiry is necessary.  20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work.  See 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982).  The claimant bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability

---

[1] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do.  The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525.  If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment.  20 C.F.R. § 404.1520(a)(4)(iii).  To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria."  20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[2] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [ ] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases *de novo* or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157-58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir.1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound

foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157-58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

**B.    ANALYSIS**

**Opinions: Dr. Shelton and Dr. Patel**

Plaintiff argues the ALJ did not properly evaluate the opinions of Dr. Patel and Dr. Shelton. (ECF No. 19 at 29).

The Social Security Administration's regulations provide that "[r]egardless of its source, we will evaluate every medical opinion we receive." 20 C.F.R. § 404.1527(c). Generally, more weight is given to the opinions of examining physicians than nonexamining physicians. More weight is given to the opinions of treating physicians since they are more likely to be able to provide a detailed, longitudinal picture of a claimant's medical impairment. *See* 20 C.F.R. § 404.1527(c). The medical opinion of a treating physician is entitled to controlling weight, i.e., it must be adopted by the ALJ, if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. *See* 20 C.F.R. § 404.1527(c)(2), SSR 96-2p, and *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence, it should be accorded significantly less weight." *Craig v. Chater*, 76 F.3d 585,590 (4th Cir. 1996). Under such circumstances, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro*, 270 F.3d at 178 (citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)).

33

In determining what weight to give the opinions of medical sources, the ALJ applies the factors in 20 C.F.R. § 404.1527(c)(1)-(6), which are: whether the source examined the claimant; whether the source has a treatment relationship with the claimant and, if so, the length of the relationship and the frequency of examination; the nature and extent of the treatment relationship; the supportability and consistency of the source's opinion with respect to all of the evidence of record; whether the source is a specialist; and, other relevant factors. *See* SSR 96-2p; *Hines v. Barnhart*, 453 Fd 559,563 (4th Cir. 2006).

Dr. Shelton

In June 2016, Dr. Shelton completed a form. (Tr. 568). Plaintiff first began treating with Dr. Shelton in July 2015. Plaintiff was seen about every two months. (Tr. 568). Prognosis was poor. Plaintiff's impairments could be expected to last 12 months. Plaintiff could stand/walk 0-2 hours each total in a workday. Plaintiff could occasionally lift less than 10 pounds and 10 pounds. Plaintiff could occasionally finger/grasp, rarely handle/bend, and never crouch. (Tr. 568). Plaintiff's pain would frequently be severe enough to interfere with attention and concentration to perform even simple work tasks. (Tr. 568). Plaintiff would be absent more than four days a month. (Tr. 568).

As to Dr. Shelton, the ALJ found:

> Dr. Heather Shelton, the claimant's primary care physician, prepared a document describing limitations that would preclude all work activity (Exhibit 8F). That report is given little weight, as neither in that document nor in her ongoing treatment records does Dr. Shelton identify specific functional limitations to support the extreme limitations she described. No record of any other source treating the claimant identifies clinical findings to support such limitations.

(Tr. 21). Substantial evidence supports the ALJ's weight as to Dr. Shelton's limitation opinions, as the ALJ noted treatment records did not support extreme limitations; many of the contemporaneous

records of treatment with Dr. Shelton are normal exams in multiple categories and no such limitations were noted contemporaneously. (Tr. 637, 631, 634, 641, 628, 624, 621, 1301, 1298, 997, 1002, 994, 1282, 1275 ). Further, Dr. Shelton noted in 2016 that Plaintiff performed cardio, strength training, and reported jogging up to 60 minutes a day. (Tr. 997, 1001). Such notes are not supportive of the limitations opined by Dr. Shelton.

Dr. Patel

In June 2016, Dr. Patel completed a form but page 4 of 5 was not submitted. (Tr. 567). He saw her every three months. She met the FM criteria. She had other impairments of RLS and vitamin D deficiency. (Tr. 564). Prognosis was good. He answered "no" on whether Plaintiff's impairments had lasted 12 months or were expected to last 12 months. Under the question "identify findings," he answered "no inflammatory arthritis." (Tr. 564). Symptoms were multiple tender points, non-restorative sleep, chronic fatigue, numbness and tingling, myofascial pain syndrome, and multiple trigger points. (Tr. 564-565). Plaintiff had pain in cervical, hands/finger, hips, leg, and knees. Plaintiff did not have pain in shoulders, arms, ankles, or feet. (Tr. 565). Pain was mild and improved with medication. (Tr. 565). Fatigue precipitated pain. Emotional factors did not contribute to severity of symptoms and limitations. Plaintiff's pain was seldom sufficiently severe to interfere with attention and concentration. (Tr. 565). Plaintiff had a slight limitation in ability to deal with work stress. Plaintiff had no side effects to medication. Plaintiff could walk 3-4 blocks without rest or severe pain. (Tr. 566). Plaintiff could continually sit, stand, or walk at one time, 4 hours.[3] Plaintiff

---

[3] There is a continued assertion throughout Plaintiff's brief that Dr. Patel's opinion is that the maximum Plaintiff could walk/sit/stand was four hours in a workday, thus arguing preclusion of ability to complete a workday. The question Dr. Patel completed was not regarding a work day but was the period of time at one time that Plaintiff could continually sit, stand, or walk. (Tr. 566).

did not need to shift positions at will. Plaintiff did not need to lie down. Plaintiff did not need elevation. Plaintiff did not need an assistive device. (Tr. 566).

As to Dr. Patel's opinion, the ALJ found: "As for the opinion evidence, it is noted that Dr. Supen Patel, the claimant's treating rheumatologist, prepared a functional assessment for her in June 2016, though the document in the record is missing one page (Exhibit 7F). That report is given partial weight, particularly as Dr. Patel described her as experiencing only mild pain that is improved with medication." (Tr. 21). Plaintiff argues the ALJ gave very little weight to Dr. Patel; the record belies this. (ECF No. 19 at 30). Plaintiff argues Dr. Patel supports Dr. Shelton's opinion; however, the record displays limitation opinions that are inapposite. (ECF No. 19 at 30). For example, Dr. Patel found Plaintiff's pain was <u>seldom</u> sufficiently severe to interfere with attention and concentration and Plaintiff could continually sit, stand, or walk at one time, <u>4 hours</u>. (Tr. 565). Whereas Dr. Shelton had found Plaintiff could stand/walk 0-2 hours each total in a workday and Plaintiff's pain would frequently be severe enough to interfere with attention and concentration. (Tr. 568) Substantial evidence supports the ALJ's consideration of Dr. Patel's opinion.

## RFC: Physical and Mental

Plaintiff argues the RFC regarding light unskilled work is not supported by substantial evidence because of pain, standing, and walking, and upper extremity limits. (ECF No. 19 at 26-27). Plaintiff argues the record does not support an RFC of ability to sustain a regular work week. (ECF No. 19 at 28-29). Plaintiff argues the mental limitations given in the RFC ignores evidence of Plaintiff's panic attacks, social withdrawal, poor energy, and difficulty concentrating/thinking. (ECF No. 19 at 32-34).

An adjudicator is solely responsible for assessing a claimant's RFC. 20 C.F.R. § 416.946(c).

In making that assessment, he must consider the functional limitations resulting from the claimant's medically determinable impairments. Social Security Ruling ("SSR") 96–8p, 1996 WL 374184, at *2. This ruling provides that: "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96–8, *7. "The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* Additionally, " 'a necessary predicate to engaging in a substantial evidence review is a record of the basis for the ALJ's ruling,' including 'a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence.' " *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (*quoting Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013)). The ALJ considers the evidence in the record as a whole when analyzing Plaintiff's claims, as does this court when reviewing the ALJ's decision. *See Craig*, 76 F.3d at 595.

When a claimant has more than one impairment, the Commissioner "must consider the combined effect of a claimant's impairments and not fragmentize them." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). (citations omitted). The ALJ is required to "adequately explain his or her evaluation of the combined effects of the impairments." *Id.* This court must uphold the Commissioner's decision as long as it is supported by substantial evidence. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). Regulations require that an ALJ "consider the limiting effects of all [the claimant's] impairment(s), even those that are not severe," in determining the claimant's RFC. 20 C.F.R. § 416.945(e); *see also* SSR 96–8p ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that

are not 'severe.' ").

Physical

Plaintiff argues the RFC regarding light, unskilled work is not supported by substantial

evidence because of pain, standing, and walking, and upper extremity limits. (ECF No. 19 at 26-27).

Plaintiff argues the record does not support an RFC of ability to sustain a regular work week (ECF

No. 19 at 28-29).

> After thoroughly discussing the records, the ALJ noted:
>
> The clinical picture reflected in these treatment records shows quite limited objective findings to support the disabling limitations asserted by the claimant. Diagnostic studies of her knee showed only limited findings until early in 2018, and she then underwent partial arthroplasty. She had a normal post-operative course and good recovery of function of that knee within about two months of physical therapy (Exhibit 24F, pages 47-50). She has been on an essentially stable course of treatment for fibromyalgia, and her treating rheumatologist has described her condition as mild pain, improved with her medications (Exhibit 7F). She has had few acute exacerbations of asthma on a stable treatment regimen. She has received only limited treatment for her carpal tunnel syndrome. She has not required acute treatment for panic attacks, and she had a long period when she stopped her medications due to the absence of such attacks. The notes of her physicians do not show that she has reported to them the same limitations of the severity she alleges. There are no sustained clinical findings to substantiate disability. The objective clinical findings from her treating sources support the residual functional capacity described above.

(Tr. 20). The record belies Plaintiff's assertions. Plaintiff reported to Dr. Shelton jogging up to 60

minutes. (Tr. 1001). While Dr. Patel listed pain in hands/finger and stated Plaintiff did not have

pain in shoulders/arms, Dr. Patel opined Plaintiff's pain was only mild and improved with

medication. (Tr. 564-66). Plaintiff listed working out as a hobby and quickly met goals of physical

therapy with each knee. (Tr. 21). As to wrists, the ALJ noted Plaintiff received only limited treatment

of injections and a splint and EMG/NCS studies showed mild carpal tunnel and no evidence of

radiculopathy. (Tr. 19-21, 51, 1009-10010, 1326). As to heel pain/spurs, the ALJ discussed

treatment of this and that the lower extremities EMG/NCS was normal. (Tr. 20). As to fatigue/sustaining a workweek, as discussed above, Dr. Shelton's opinion, upon which Plaintiff relies, was given little weight and such finding was supported by substantial evidence.

Mental

The ALJ's extensive RFC included: "Due to her mental impairment, she is further restricted in that she can understand and carry out only one and two-step tasks. She can occasionally interact with supervisors and co-workers, but cannot perform tandem or team style activities. She can occasionally interact with the general public but cannot perform direct customer service. She cannot perform high-speed tasks or work in a high quota environment. She is able to adapt to routine changes in a work setting and duties." (Tr. 17). The ALJ considered Plaintiff's testimony regarding severe anxiety attacks, that she is now seeing a counselor, that she has two or more panic attacks a day, and that her memory/concentration are not good. (Tr. 18). The ALJ considered the record of mental impairment treatment:

> In terms of her mental allegations, the claimant was treated in her primary care clinic for a panic disorder (without agoraphobia) since at least early 2012, with a prescription for Xanax (Exhibit 11F). Subsequent notes report that the claimant stopped taking Xanax in January 2013, with her physician then deleting the diagnosis of panic disorder from her clinic notes (Exhibit 11F, page 109). On May 24, 2016, the claimant reported that panic attacks had recurred for her and requested to restart Xanax (Exhibit 11F, pages 5-8). She was again started on Xanax.

> On January 10, 2017, the claimant returned to her primary care clinic, describing increased symptoms and panic attacks (Exhibit 20F, pages 4-7). Her Xanax was refilled and she was prescribed Trazodone. She was also referred to a counselor. At another visit, on April 11, 2017, the claimant stated that her panic attacks were stable and that she was not then seeing the counselor (Exhibit 30F, pages 12-14). She was then taking Xanax, Cymbalta, and Trazodone, and those medications were continued. On June 20, 2017, she received a new prescription for Seroquel for her anxiety complaints (Exhibit 30F, pages 6-8).

(Tr. 20). The ALJ later concludes: "She has not required acute treatment for panic attacks, and she had a long period when she stopped her medications due to the absence of such attacks. The notes of her physicians do not show that she has reported to them the same limitations of the severity she alleges." (Tr. 20). The ALJ also reviewed and weighed an opinion with no treating record support from Plaintiff's counselor:

> Vanessa Lubo, the claimant's mental health counselor, has submitted an assessment dated August 24, 2018, describing mental limitations that would preclude all work activity (Exhibit 29F). That report is given little weight. The record contains no treatment records from Ms. Lubo and no objective clinical findings to support the extreme limitations described. No other source treating the claimant has suggested mental limitations of that severity. The records show long periods without complaints or apparent symptoms, and the document submitted acknowledges the long period when the claimant was not receiving counseling.

(Tr. 21). As to Plaintiff's *Mascio* argument, the RFC was far more extensive here than just a limitation to unskilled work or simple tasks.

Based on the ALJ's opinion and the record as a whole, the ALJ properly espoused mental and physical RFC limitations in accordance with the applicable rules, regulations, and guidance. It cannot be said that substantial evidence fails to support the assessment in regard to RFC limitations. The standard of review here is not whether conflicting evidence might have resulted in a contrary decision, but it is whether substantial evidence supports the ALJ's decision. Based on the evidence before the ALJ, the ALJ conducted a proper evaluation of the RFC and cited substantial evidence to support the findings.

**Other Alleged Impairments**

Plaintiff argues the Commissioner did not specifically address Plaintiff's other alleged severe impairments, including left patellofemoral pain, migraine headaches, depression, and anxiety with

panic attacks. (ECF No. 19 at 24).

Reviewing the ALJ's opinion as a whole, it is evident that Plaintiff's mental health allegations were fully discussed. (Tr. 15-20). The ALJ discussed Plaintiff's left knee pain complaints. (Tr. 19-21). The ALJ discussed Plaintiff's headache allegations and treatment. (Tr. 18-19). Plaintiff has failed to show any harmful error regarding this argument.

**Obesity**

Plaintiff argues the ALJ failed to consider any functional limitations that may result from obesity, particularly sustaining function, walking/standing, pain, and fatigue; Plaintiff erroneously argues SSR 19-2p applies. The ALJ's opinion was issued in January 2019. SSR 19-2p did not become effective until May 2019; SSR 02-1p is the applicable guidance in this case.

SSR 02-1p provides:

Obesity can cause limitation of function. The functions likely to be limited depend on many factors, including where the excess weight is carried. An individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling. It may also affect ability to do postural functions, such as climbing, balance, stooping, and crouching. The ability to manipulate may be affected by the presence of adipose (fatty) tissue in the hands and fingers. The ability to tolerate extreme heat, humidity, or hazards may also be affected.

The effects of obesity may not be obvious. For example, some people with obesity also have sleep apnea. This can lead to drowsiness and lack of mental clarity during the day. Obesity may also affect an individual's social functioning.

An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment. Individuals with obesity may have problems with the ability to sustain a function over time. As explained in SSR 96-8p ("Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims"), our RFC assessments must consider an individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule. In

cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity. This may be particularly true in cases involving sleep apnea.

SSR 02-1p, 2002 WL 34686281, *6.

The ALJ here found obesity as a severe impairment. (Tr. 15). In discussing treatment, the ALJ noted: "She began a weight loss program at her primary care clinic during September 2016 (Exhibit 20F) and pursued that program for some time (Exhibit 30F). At all times relevant to this decision, the claimant's weight has been near or in excess of 200 pounds." (Tr. 19). The ALJ noted: "No listing is directly applicable to obesity, but that condition has been considered in determining her residual functional capacity." (Tr. 16). Plaintiff's arguments list the following limitations that "may" result from obesity: sustaining function over time, ability to walk/stand on a sustained basis with pain, and effect of fatigue. (ECF No. 19 at 25). The Fourth Circuit Court of Appeals noted in *Russell v. Chater*, 1995 WL 417576, at *3 (4th Cir. July 7, 1995), that a claimant must explain the basis of a theory as to how obesity limits his functional capacity and that speculation is not permitted. *Maner v. Colvin*, No. 1:12-2969-RBH, 2014 WL 4656383, at *5 (D.S.C. Sept. 17, 2014). Even hypothetically assuming error in the lack of a more extensive discussion regarding obesity by the ALJ here, such would be harmless as there is no record evidence of further functional limitations from obesity, particularly noting the record of Plaintiff's reports of jogging for up to sixty minutes, a treating specialist's opinion that Plaintiff could continually walk at one time for 4 hours and did not need an assistive device, and multiple normal exams. (Tr. 566, 1001); *id*; *see also Harris v. Colvin*, No. 0:15-4628-PJG, 2016 WL 6310287, at *8 (D.S.C. Oct. 26, 2016) .

**FM, SSR 12-2p**

Plaintiff argues the ALJ ignored/minimized Plaintiff's pain and limitations from FM, joint

pain, and fatigue and failed to follow SSR 12-2p. (ECF No. 19 at 28, 31).

"FM is a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months." SSR 12-2p, 2012 WL 3104869, *2. FM is a medically determinable impairment "when it is established by appropriate medical evidence." *Id.* "We cannot rely upon the physician's diagnosis alone. The evidence must document that the physician reviewed the person's medical history and conducted a physical exam. We will review the physician's treatment notes to see if they are consistent with the diagnosis of FM, determine whether the person's symptoms have improved, worsened, or remained stable over time, and establish the physician's assessment over time of the person's physical strength and functional abilities." *Id.* FM is an impairment if there is a diagnosis of FM and the diagnosis is not inconsistent with the other evidence in the record, and one of the following is provided:

> A. [requires meeting all three]:
> 1. A history of widespread pain—that is, pain in all quadrants of the body (the right and left sides of the body, both above and below the waist) and axial skeletal pain (the cervical spine, anterior chest, thoracic spine, or low back)—that has persisted (or that persisted) for at least 3 months. The pain may fluctuate in intensity and may not always be present.
> 2. At least 11 positive tender points on physical examination (see diagram below). The positive tender points must be found bilaterally (on the left and right sides of the body) and both above and below the waist.
> ...
> 3. Evidence that other disorders that could cause the symptoms or signs were excluded. Other physical and mental disorders may have symptoms or signs that are the same or similar to those resulting from FM. Therefore, it is common in cases involving FM to find evidence of examinations and testing that rule out other disorders that could account for the person's symptoms and signs. Laboratory testing may include imaging and other laboratory tests (for example, complete blood counts, erythrocyte sedimentation rate, anti-nuclear antibody, thyroid function, and rheumatoid factor).
> OR
> B. [must meet all three]:
> 1. A history of widespread pain (see section II.A.1.);

2. Repeated manifestations of six or more FM symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems ("fibro fog"), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome; and

3. Evidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded (see section II.A.3.).

> fn6: We may use the criteria in section II.B. of this SSR to determine an MDI of FM if the case record does not include a report of the results of tender-point testing, or the report does not describe the number and location on the body of the positive tender points.

> fn7: Some examples of other disorders that may have symptoms or signs that are the same or similar to those resulting from FM include rheumatologic disorders, myofacial pain syndrome, polymyalgia rheumatica, chronic Lyme disease, and cervical hyperextension-associated or hyperflexion-associated disorders.

*Id.* at *2-3(some footnotes omitted).

The ALJ found FM as a severe impairment. (Tr. 15). The ALJ stated consideration of SSR 12-2p. (Tr. 16). The ALJ considered Plaintiff's testimony regarding her FM pain. (Tr. 18). The ALJ summarized treatment notes from Plaintiff's rheumatolgist: "In terms of her medical conditions, the claimant has been treated by a rheumatologist for fibromyalgia since at least October 2012, when she was prescribed Neurontin and Naproxen (Exhibit 5F). The ongoing treatment notes from that clinic generally reflect 10 to 12 (of 18) positive trigger points during her physical examinations (Exhibits 9F, 17F, 21F, and 31F)." (Tr. 18). After reviewing medical records, the ALJ concluded: "She has been on an essentially stable course of treatment for fibromyalgia, and her treating rheumatologist has described her condition as mild pain, improved with her medications (Exhibit 7F)." (Tr. 20). The ALJ further noted that Plaintiff told other specialists she had no bone, joint, or muscle symptoms, citing Exhibit 13F. (Tr. 21).

Plaintiff argues the ALJ did not accurately summarize the evidence when stating Plaintiff's

44

FM symptoms are mild and then cites to Dr. Patel's notes. (ECF No. 19 at 28). However, the record shows Dr. Patel, Plaintiff's own treating rheumatologist, opined that pain was mild and improved with medication. (Tr. 565). Plaintiff could walk 3-4 blocks without rest or severe pain. (Tr. 566). Plaintiff could continually sit, stand, or walk at one time, 4 hours. Dr. Patel answered "no" on whether Plaintiff's impairments had lasted 12 months or were expected to last 12 months. (Tr. 564).[4] Plaintiff argues there was no consideration given to changing positions. Yet, Plaintiff's treating rheumatologist opined Plaintiff did not need to shift positions at will. (Tr. 566).

Substantial evidence supports the ALJ's decision and analysis under SSR 12-2p. The ALJ thoroughly considered, in relation to Plaintiff's impairment of FM, Plaintiff's testimony and reports and exams and notes from Plaintiff's treating doctors, as discussed above. The ALJ considered Plaintiff's FM caused some limitations but was not disabling. SSR 12-2p itself states that the analysis, even with FM, follows the normal symptom evaluation and RFC regulations and analysis factors.[5] SSR 12-2p, 2012 WL 3104869, *5. The ALJ made such considerations of the record here and related findings are supported by substantial evidence.

### III. CONCLUSION

This Court is charged with reviewing the case only to determine whether the findings of the Commissioner were based on substantial evidence. *Richardson*, 402 U.S. at 390. Even where the Plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the

---

[4] *Cf. Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 108 (4th Cir. 2020)(treating rheumatologist there had noted severe pain with no significant improvement from medication and opined claimant there was unable to work for over a year).

[5] Case law within the lower courts of the Fourth Circuit contains a multitude of decisions in this area affirming a finding of disability and of decisions remanding for further proceedings. Such analysis are case and fact specific and depend on the adequacy of the ALJ's explanation.

Commissioner's findings must be affirmed if substantial evidence supported the decision. *Blalock*, 483 F.2d at 775. The Commissioner is charged with resolving conflicts in the evidence, and this Court cannot reverse that decision merely because the evidence would permit a different conclusion. *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984). As previously discussed, despite the Plaintiff's claims, she has failed to show that the Commissioner's decision was not based on substantial evidence. Based upon the foregoing, and pursuant to the power of the Court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in social security actions under sentence four of Sections 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. Sections 405(g) and 1338(c)(3), the Commissioner's decision is AFFIRMED.

s/ Thomas E. Rogers, III

Thomas E. Rogers, III

United States Magistrate Judge

March 17, 2021

Florence, South Carolina